Haynes, J.
(orally.)
This case is brought into this court upon a petition in error ■to reverse the judgment of the court of common pleas, and arises under a statute passed by the legislature of the state of Ohio, ou the 25th of April, 1890, entitled “An act to compel children under 14 years of age to attend school a certain length of time each year.” The case is one of importance; and the defendant in the case — the plaintiff in error here — denying the right of. the legislature under the constitution of the state to pass the law in question, has determined to resist the .law, for the purpose of raising the constitutional questions, *639 •■•and ultimately having them decided by the Supreme Court of ■the State. We regret very much that in a case of this nature, -we have not the power to reserve it directly to the Supreme Court, so that the questions of.law might be passed upon by that • court in the first instance; but inasmuch as we are unable to do that, we have given the case careful consideration, and will endeavor to state in substance the conclusions at which we ■ have arrived.
Before coming to the main questions made in the case, there are one or two questions arising in regard to the prosecution ■of the suit. The first is, that the court of common pleas did not have jurisdiction of the case, for the reason, as is claimed, ■that, by the 13th section of the act as amended, jurisdiction to try this offense is vested either in a mayor’s court, justice of the peace, or probate judge. The section reads as follows:
“ Any person or officer mentioned in this act, and designated as having certain duties to perform in the enforcement of any of its provisions, neglecting to perform any such duties, shall be liable to a fine of not less than $25 nor more than $50 for each and every offense ; and .mayors, justices of the peace and probate judges shall have jurisdiction to try the offenses described in this act, and their judgment shall be final.’’
The question was raised, both upon the trial of the case, and upon a motion in'arrest of judgment,. au<¡L was disposed of by the court of common pleas, in art elaborate opinion upon the final motion for arrest of judgment. The opinion of that court upon that question may be found in' the Law Bulletin of August 24, 1891, commencing upon page 129. I shall not restate the positions that are taken by the court in that case, but any one interested in 'the question will find a very full discussion of the same in that decision. Suffice it to say, that the ground upon which the motion in arrest of judgment was overruled was, that substantial provision had been made for the punishment of the same offense prior to the passage of this amendment, and that by the rules of law that ¿should prevail in this case, where the act amending the origi *640 nal act had provided jurisdiction in certain courts, as it has-here, it gave to those courts a concurrent jurisdiction with the court of common pleas, and did not oust the court of common pleas of the jurisdiction which it had before that time. With the decisions cited and the statements of the rules of law as-made by the court of common pleas, we are disposed to abide, and therefore hold that the court did not err in overruling the motion in arrest of judgment, and in holding that the court of common pleas had jurisdiction to hear the case.
Another question, touching the method of proceeding in the case, is made by counsel in their objection to the manner in which the jury was impanelled; or, more correctly stated perhaps, to the fact that the court allowed the State to call for a struck jury, and allowed that jury to hear and determine the case. Proper objections were made to the impanelling of the struck jury, so that the question is properly before us. And the ground taken by counsel in regard to that, is, that the statute which provides for a struck jury is applicable only to the trial of an issue of fact in a civil action, and is not applicable to the trial of an issue of fact in a prosecution under an indictment.
Without going into that matter very elaborately, we are of the opinion that the case has practically been decided by the Supreme Court of this state in the case of Hulse v. The State, 35 Ohio St. 421. In that case a struck jury was demanded by the defendant, and proceedings were taken to strike a jury under the statutes then in force for the impanelling of a struck jury in a civil action. In the performance of that duty, however, the auditor being absent, the chief deputy in his office performed the duties assigned to the auditor, and in like manner the. chief deputy in the office of the county clerk performed the duties assigned to the clerk of the court of common pleas. And thereupon a challenge was made to t.he whole array, for the reason that these officers respectively were not authorized to select the jurors, and therefore the *641 jurors were illegally selected. The court, after citing the statute in regard to the impanelling of a jury, said :
“These provisions, it will be seen, are found in that part of the revision relating to practice in civil cases, but they also •apply to criminal cases except that those relating to a struck jury do not apply to a capital case.”
It is suggested by counsel that the Supreme Court was not ■authorized in this particular case to make the decision that it did; that it was extra-judicial, so far as that case was concerned ; and that under the statute — secs. 7275 and 7276— the court was not authorized to make that statement.
In relation to juries in prosecutions, the statutes of the state provide, in secs. 7267 to 7276, in regard to the impanelling of jurors in capital cases. Then sec. 7276 provides :
“ In all other criminal cases the jury summoned and impanelled according to the provisions of the law relating to the summoning and impanelling of juries in other cases shall try the accused.”
It appears to us that the Supreme Court, in passing upon this question, would be called upon to inquire, in the very ■first instance, whether the provisions of law applicable to the impanelling of a jury in a civil action would be applicable to thq impanelling of a jury in a criminal prosecution; and it practically decides that they are. And, indeed, as a matter of fact, ever since the enactment of these statutes, the juries impanelled for the trial of ordinary criminal cases, have been impanelled in accordance with the law in regard to civil cases, and under and by virtue of this section 7276. We are very • clear that the court below did not err in overruling the various ■ objections to the impanelling of this struck jury. We see no reason, inasmuch as the statute provides that any person or any party to an action may demand a struck jury, why the State should not have the same right to demand a struck jury that the defendant has. In the case in 35 Ohio St., the defendant demanded a struck jury, and the court held the deputies had not the right to perform the duties devolving upon their *642 principals, and reversed the case, and sent it back, but nowhere-suggested that the defendant had not the right to demand a. struck jury and to have it impanelled for the trial of the case.
We now come to the more important questions which were fnade in the case, and these relate to the statute itself. Testimony having been offered for and on behalf of the State, and also on behalf of the defendant, the defendant’s counsel at the close of the trial, before the charge of the court, requested the court to charge the jury as foliovvs:
“ Gentlemen of the jury: The court instructs you as a matter of law:
“1. That the legislature of the state of Ohio had no-authority to enact those portions of the law commonly known as the compulsory education law, passed April 15th, 1889, .more accurately described as “ An act to compel children under 14 years of age to attend school a certain length of time-each year,” passed April 15, 1889, or of the -various acts amendatory and supplemental thereto, which make the attendance of children at school compulsory, under penalties upon-the children or their parents, guardians, or other persons having them in charge, in case'of failure of such attendance on the part of said children, as well as those portions which relate and prescribe what amount of instruction in; secular 'knowledge children of school age shall receive; such legislation being contrary to-the provisions of the constitution now-in force in this Stase, as the organic law thereof.”
. And this request the court refused to give, and to such refusal the defendant, by his attorneys, then and there duly excepted.
“ 2. That the sections of said act or acts under which it is sought to base the prosecution in this case, being dependent upon and necessarily connected with, and only in furtherance of the end contemplated in said other portions of the act as-above described, necessarily fall with these portions.”
■ That was refused, and the- refusal excepted to.
*643 “ 3. That there is no other law than that above described, warranting this prosecution, wherefore you will in this case return a verdict of not guilty.”
That request was also refused, and an exception taken.
The court then proceeded to charge the jury. And inasmuch as exceptions were taken substantially to the whole of the charge as made, it is perhaps well that I. should read the charge, or the portions of it excepted to, and discuss the •questions that are raised thereon in their order: -
The court having stated that the prosecution was under this law, proceed to say:
“ The principle of this law is not a new one in the state. In the year 1877 a law was passed by the legislature of this state-making it the duty of every parent or other person having in his charge children under certain ages, or between certain ages, to send them to school a certain length of time each year,, and imposing a fine upon every violation of this duty.- Since the year 1877, down to the present time, the principle of compulsory education, or the enforced attendance upon school of the children in the state, has been a part- of our legislation as to schools; and until this case, so far as I am aware, the authority to pass such laws was never questioned in the courts.
“ This law — the law involved in this prosecution — does not abridge the right or the duty of parents to educate their children; it recognizes the right, and seeks to enforce the duty. The law does not interfere with the control or management of private schools. Attendance upon a parochial or other private school is not forbiddeu. On the other hand, it is a full compliance with the'law; and children'in the state who attend parochial or other private schools are not by this law compelled to attend public schools. The language of the law is: ‘ Every parent, guardian or person having control and charge of any child between the ages of eight and fourteen years shall be required to send any such child or children to a public or private school for a period of not less than twenty weeks in each year.5 But this requirement is not an absolute one. Under *644 the provisions of the law children may, in certain cases, be excused from attending any school, as where their physical or mental condition is such as to disable them from attending school, or where they are taught at home by some qualified person; and perhaps in other cases specified in the law.
“ This law, I say to you, gentlemen, is a constitutional and valid enactment. An extended discussion at this time will not ■be expected from the court; in fact, it is not necessary, as the reasons for this conclusion will sufficiently appear by a brief reference to some of the provisions of the constitution and the decisions thereunder of the Supreme Court of the state.
“In sec. 1, art. 2 of the constitution, it is provided that ‘the legislative power of this state shall be vested in the general assembly, which shall consist of a senate and house of representatives.’ ‘This provision,’ say the Supreme Court, ‘ is not that the legislative power as conferred in'the constitution shall be vested in the ■general assembly, but that the legislative power of this state «hall be vested. That includes all legislative power which the ■objects and purposes of the state government may require. And we must look to other provisions of the constitution to see how far and to what extent the legislative discretion is qualified or restricted. Hence, the difference between the constitution of the United States and a state constitution, such as ours. In the former, we look to f^ee if a power is expressly ■given ; in the latter we look to see if it is denied or limited. Therefore, when the power of the general assembly to enact :any particular law is drawn in question, the proper inquiry is,, whether such an exercise of legislative power is clearly prohibited by the constitution. The grant of power being general, the question is as to the existence of a limitation arising from special prohibition. And such prohibition must either be found íd express terms, or be clearly inferable by necessary implication from the language of the instrument, when fairly construed, according to its manifest spirit and meaning.’
“ It is not claimed in this cause that the passage by the legislature of compulsory education laws is specially prohibited by *645 the constitution; but it is argued that the power to pass such laws is impliedly prohibited by sec. 20 of art. 1, which reads as follows: ‘ This enumeration of rights shall not be construed to impair or deny others retained by the people; and all powers not herein delegated remain with the people.’
“ Again it is fortunate that the Supreme Court of the state has given to us a very clear exposition of the meaning of this constitutional provision. ‘ This clause,’ that all powers not herein delegated remain with the people means exactly what its words import; but even from them a plain implication arises that the powers in and by the constitution delegated do not remain with the people, but are vested in the agents and officers of the government to be exercised by them .alone. Among the powers delegated by the constitution is the legislative power of the state, which is vested in the general assembly. Whatever limitations upon the power thus delegated to the general assembly may be found in other provisions of the constitution, it is quite clear that sec. 20 of art. 1 does not impose any limitation upon it whatever. That section only declares that powers not delegated remain with the people. It does not purport to limit or modify delegated powers.’
“ If there was any doubt that the terms of the constitution, whereby the legislative power of the state is vested in the general assembly, are comprehensive enough to authorize the enactment of a law like the one in question, an examination of the provisions of the constitution relating to schools will remove all such doubt. By section 7 of art. 1, it is made the duty of the general assembly to pass suitable laws to encourage schools and the means of instruction. By sec. 2 of art. 6 it is made the duty of the general assembly to make such provision, by taxation or otherwise, as with the income arising from the school trust fund will secure a thorough and efficient system of common schools throughout the state.
“ In commenting upon these constitutional provisions the Supreme Court say : ‘ The system of public education in Ohio is *646 the creature of the constitution and statutory laws of the state. It is left to the discretion of the general assembly in the exercise of the general legislative power conferred upon it to determine what laws are ‘suitable7 to secure the organization and management of the contemplated system of the common schools.7 Witlr this legislative discretion the court has no power to interfere, exceptso far as its exercise is limited or restrained by the constitution. ‘ All implied restrictions, which rest upon theory only, the people have been content to leave to the judgment and patriotism and sense of justice of their representatives.7 It is a well established rule that the courts-are not authorized to declare a law unconstitutional and void, unless it is clearly in conflict with some of the provisions of the constitution, and-that every doubt must be clearly resolved in favor of the law.. No such conflict being shown between this law and any provision of the constitution, it follows that the legislature had-the lawful power to pass it, and that each and all of its provisions are binding upon all persons to whom they are applicaable. If the law is unwise or oppressive, or unjust, such fact is a good reason why steps should be taken to secure its repeal,, or to secure the removal of any of its objectionable features, if it have any; but it furnishes no excuse for the violation of the-law. The remedy for unwise legislation cannot be'administered by the courts. So long as the law is in force, it is the duty of all to obey it, and the duty of the courts, whenever occasion requires it, to enforce its penalties.77
To that charge an exception was taken, in due form, and the question has been re-argued here, with great learning and ability. It is claimed that the statute is unconstitutional:
1. Because it interferes with the parental authority and the-parental right to direct as to the education of his children. And—
2. Because of the penalties that are imposed by one section* of the statute.
Very elaborate arguments have been made as to the right of the parent over the child — the right of the father to the- *647 care and custody of the child ; the right to guard and guide as to its education; on the rights to its services; on the right to its companionship, and the right to retain the child in his care and have control over it — these have all been stated with a great deal of ability.
The general right of the father, and of the parent, to the custody of the child, is not, as we understand it, very different in Ohio from what is claimed by counsel. We think that right is very fully recognized by the courts in this state; but to the law in regard to that matter there are exceptions — as there are exceptions to all general rules of law — and it has been said, by the Supreme Court Commission (in Clark v. Bayer, 32 Ohio St. 299, syllabus):
“ As a general rule the parents are entitled to the custody of their minor children. When they are living apart, the father is, prima facie, entitled to that custody, and, when he is a suitable person, able and willing to cai'e for them, his right is paramount to that of all other persons, except that of the mother in cases where the infant child is of such tender yeai’S as.to require her personal care ; but in all cases of controverted right to custody, the welfax’e of the minor child is first to be considered.
“ The father’s right is not, however, absolute under all circumstances, He nxay relinquish it by contract, forfeit it by abandonment, or lose it by being in a condition of total inability to afford his minor children necessai’y care and support.”
This case arose in a controversy in regard to the custody of a child, but it states the rights of pax-ents. Judge Ashburn, in delivering the opinion of the court, thus states the law:
“ In this country there is quite a uniformity in the decisions in relation to the rightful custody of infant children. The general spirit of modern adjudged cases on this subject, both in England and the States, does not essentially differ. As a general rule, the father is considered as being entitled to the custody of his minor childi-en, and in case of his death or incapacity, the mother. In cases of controvei'ted custody, the *648 present and future interests of the ruinor controls the judgment and directs the discretion of the courts. While the legal rights of parents are to be respected, the welfare of the minor is of paramount consideration. If necessary to attain that end, the custody of minor children, will be taken from their parents or refused to them.”
The same principle, as we understand it, is recognized in two other cases, among others in the case of Prescott v. The State, 19 Ohio St. 184, and in The Cincinnati House of Refuge v. Ryan, 37 Ohio St. 197, and as these two cases go together, that is, on the question of the custody and control of children, and also in regard to the penalties, 1 will refer to them.
In the Prescott case, an accusation was made in the Van Wert County Common Pleas, before the grand jury, “that Benjamin Prescott, on February 8, 1869, in that county, unlawfully, wilfully, maliciously and feloniously, burnt and •caused to be burnt a barn;” and the grand jury reported to the court of common pleas that they had examined the evidence in regard to the matter, and that they found the accusation to be true; that it was supported by sufficient evidence to put Prescott on trial upon the accusation; “ that he was a male infant under the age of sixteen years, and of the age of fourteen years at the time of the return ; that he was then and had been for more than a year past a resident of Van Wert county; that .he was vicious and incorrigible, and a suitable person to be •committed to the guardianship of the directors of the House of Refuge or to the Reform Farm in Ohio; and that finding him ’ to be such a person, they make the return as stated, instead of an indictment, for the court to take such action in the premises as the law provides.”
Thereupon, under that state of facts, without further trial, he was committed to the Reform Farm, and on his behalf a writ of error was prosecuted to reverse the order and judgment of the court of common pleas.
Judge White, in delivering the opinion of the court, says:
“ The proceedings disclosed in the record were had under *649 the eighth section of the act to authorize the establishment of houses of refuge, and the statutes subsequently enacted enlarging the operation of that act so as to authorize commitments to be made to ‘ The State Reform Farm,’ from any county in the state.
“ The decision of the case depends upon the validity of the section named, which provides: ‘ If any accusation of the commission of any crime shall be made-against any infant under the age of sixteen years, before any grand jury of the county, .... and'the charge appears to be supported by evidence sufficient to put the accused upon a trial, the grand jurors may, in their discretion, instead of finding an indictment against the accused, return to the court that it appears to them, that the accused is a suitable person to be committed to the guardianship of the directors of the house of refuge, and the court shall thereupon order such commitment.’.
“ The subsequent legislation authorizes the commitment to be made to the guardianship of the board of commissioners for reform schools, who are invested by law with the care and control of the reform farm.
“In the assignments of error it is claimed that the statute in question is in conflict with Art. 5 of the amendments to the constitution of the United States; also with sections 5 and 10 of Art. 1 of the constitution of the state ”
Then, overruling the objection in regard t.o the amendment to the constitution of the United States as not applicable to the state laws, he proceeds:
“ The provision referred to in our state constitution relates to the preservation of the right of ti’ial by jury, and to the rights of the accused in criminal prosecutions. We do not regard this case as coming within the operation of either of these provisions. It is neither a criminal prosecution, por a proceeding according to the course of common law, in which the right to a trial by a jury is guaranteed.
“ The proceeding is purely statutory; and the commitment in cases like the present is not designed as a punishment' for- *650 .the crime, but to place minors of the description, and for the causes specified in the statute, under the guardianship of the public authorities named, for proper care and discipline, until they are reformed, or arrive at the age of majority. The institution to which they are committed is a school, not a prison; nor is the character of their detention affected by the fact that it is also a place where juvenile convicts may be sent, who would otherwise be condemned to confinement in the common jail or the penitentiary.”
And after further discussion as to the acts and the rights of the parties under it, he for the court affirms the judgment. It is proper to say, however, that under that statute, this being in the nature of an ex parte proceeding, the question might be again inquired into with regard as to whether the commitment was properly made.
In the case in 87 Ohio St., House of Refuge v. Ryan, the children in controversy in that case having been committed by order of a justice of the peace to a house of refuge under a paragraph of sec. 2087, Rev. Stat., as amended 77 Ohio L. 217, which paragraph authorizes a mayor, police judge or justice to 'commit minors under sixteen years of age to a house of refuge upon complaint and due proof that they are homeless, -or are without proper and suitable homes, objection was made as to the constitutionality of the law. Judge Johnson delivered the opinion of the court, and among other things says:
“ The proceeding is purely statutory. It is intended to pro- ■ vide a summary method of caring for destitute children.
“ The commitment is not designed as a punishment for crime, but to place destitute, neglected and homeless children, and those who are in danger of growing up as idle and vicious members of society, under the guardianship of the public .authorities for their proper care, and to prevent crime and • pauperism. As to such infants, it is a home and aschoolj not a prison. While no provision is made for a notice to those interested, if such there be, of the pendency of the proceeding, yet it would doubtless be proper for the examining officer, *651 -where it is practicable, before making the order, to require such notice; but the statute does not seem to require it as essential to the exercise of this power. As was said in Prescott v. Slate, 19 Ohio St. 188, where a similar question arose, {neither the infant, nor any person who would in the absence' of such commitment be entitled to his custody and services, will be without a remedy.’ The statute itself, as well as the provisions relating to habeas corpus, provide an adequate and complete remedy. In such a direct proceeding, the commitment does not operate to restrict the power of the court, on habeas corpus, to inquire fully into the cause of the detention, .and to determine upon the whole case whether the parent is entitled to the custody of his child.
“The court below should have fully heard this case upon its merits, the commitment being in due form, and if the father was not a suitable person to have the care of those children, should have remanded them to the custody of defendants, until legally discharged. The authority of the state, as parens patriae, to assume guardianship and education of neglected homeless children, as well as neglected orphans, is unquestioned. The institutions of public charity, for this purpose; in this state, are a subject of just pride to every citizen. The provisions of the law under which these institutions are maintained, should receive such a construction as will not defeat their humane intention. So long as the management of •these institutions is held in public account, and is amenable to the courts, there need be no apprehension that personal rights will be infringed, specially where, as in this case, direct and ample remedies by habeas corpus are provided for the protection of the legal rights of parents and others.”
The first section of the statute under which this case is prosecuted, provides :
“ That all parents, guardians and other persons who have -care of children, shall instruct them, or cause them to be instructed, in spelling, reading, writing, English grammar, geography, and arithmetic; and every parent, guardian, *652 or other person having control and charge of any child between the ages of eight and fourteen years, shall be required to send any such child or children to a public or private school for a period of not less than twenty weeks in city districts in each year, ten weeks of which at least, shall be consecutive, and in village or township districts not less than sixteen weeks in each year, eight of which shall be consecutive, unless such child or children are excluded from such attendance by the superintendent of the public, private or parochial schools in cities, or by authority of the board of education in villages and townships, when it shall have been shown to the satisfaction of said superintendent, or said board, that the physical or mental condition of such child or children has been such as to prevent his, her, or their attendance at school, or that said child or children are taught at home by some qualified person or persons in such branches as are usually taught in primary schools.”
Section 5, as amended, and which was passed in 1889, provides that:
“ All children between the ages of seven and fourteen years who are habitual truants from school, or while in attendance at any public or private school, are incorrigible, vicious and immoral in conduct; and all children between said ages, and all minors between the ages of fourteen and sixteen who cannot read and write the Euglish language, who absent themselves habitually from school, and habitually wander about the .streets and public places during school hours, having no business or lawful occupation, shall be deemed juvenile disorderly persons, and subject to the provisions of this act.”
And after providing lor truant officers and his duties, they further provide:
“ That it shall be the duty of all truant officers to examine into all cases of truancy when any such comes before their notice, or when requested to do so by the superintendent of public schools, or by the board of education to warn such truants, their parents or guardians, in writing, of the final consequences *653 of truancy if persisted in, and also to notify the parent, guardian or other person having the charge and control of any juvenile disorderly person, that the said person is not attending any school, aud to require said parent, guardian, or other person to cause the said child to attend some recognized school within five days from said notice, and it shall be the duty of said parent, guardian, or other person having the legal charge and control of said child, to cause the attendance of said child at some recognized school. If said parent, guardian or other person having the legal charge and control of said child, shall wilfully neglect, fail or refuse to cause said child to attend some recognized school, it shall be the duty of such officers to make, or cause to be made, a complaint against said parent, guardian or other person having the legal charge or control of such child, in any court of competent jurisdiction in the city, village or township in which the offense occurred, for such refusal, failure or neglect, and upon conviction thereof said parent, guardian or other person, as the case may be, shall be punished by a fine of not less than $5, nor more than $20, or the court may at its discretion, require persons so convicted to give bonds in the penal sum of $100, .with one or more sureties to be approved by said court, .conditioned that said persons so convicted shall cause the child or children under his or her legal charge or control to attend some recognized school within five days thereafter, and to remain at said school during the term prescribed by law; provided, that if said parent, guardian or other person in charge of such child shall prove inability to cause said child to attend said recognized school, then said parent, guardian or other person shall be discharged, and said court, upon complaint of said'truant officer, or. other person; that said child is a juvenile disorderly person, as described in section five of this act, shall proceed to hear such complaint, and if said court shall determine that said child is a juvenile disorderly person within the meaning of this-act, such child shall be deemed guilty of a misdemeanor, and said court shall thereupon sentence said dhild to some juvenile reforma *654 tory, or county children’s home, until such child shall arrive at the age of sixteen years, unless sooner discharged by the board of trustees of said reformatory or home. Provided, however, that said sentence may be suspended in the discretion of the court, for such time as the child shall regularly attend school and properly deport himself or herself. It is further provided that if, for any cause, the parent, guardian or person having charge of any juvenile disorderly person, as defined in this act, shall fail to cause such juvenile disorderly person to attend said recognized school, then complaint against such juvenile disorderly person may be made, heard and tried and determined in the same manner as provided for in case the parent pleads inability to cause said juvenile disorderly person to attend said recognized school.”
The prosecution in this case is not under either of these sections ; but it is claimed by counsel in argument that the duties which are devolved upon principals of schools are ancillary, or made for the purpose of enabling the truant officer to properly prosecute cases of this kind, and that if these sections should be found to be unconstitutional, the whole law should fail. And the question is, whether these sections are unconstitutional. We are clearly of the opinion that the Supreme Court has practically answered the question for us in the decisions we have already cited. We are aware that the question is a disputed one; and counsel have cited to us a case that may be found in 55 Ill. 280, People v. Turner, wherein the Supreme Court of Illinois have taken very decided ground against the validity of enactments substantially like our own acts in regard to houses of refuge and reformatories such as are passed upon in 19 and 37 Ohio St., which we have cited. But we think we are but following the spirit and principles of the decisions in 19th and 37th Ohio St. above cited in holding that the above sections are not unconstitutional.
It will be noticed in these cases cited that while provision is made for the bringing of the child by habeas corpus before the proper court, to inquire into the cause of its detention, yet the *655 supreme court say, if the parent is not the proper person to have the custody of the child, he or she may be remanded to the authorities of the reform school, to remain in the custody of the reform school, as provided under the action that I have referred to. It will be noticed also in the section which I have read, that the court itself which sentences the child to the reform school, has power to suspend that sentence, if the ■child shall readily attend school, and properly deport himself or herself; and we suppose that discretion is a continuing discretion to be exercised at any time for the good of the child. The statute to some extent seems to rest upon the police power of the state. The authority to act may be placed also under the right that the state assumes to look after the care and custody of children who are without proper care and custody from their parents. As was stated by the court of common pleas in its charge, the sending of children to school, either private or otherwise, where they may be taught to perform their duties to the state, or be educated so that they may intelligently perform those duties, is favored ; and it is only when the parent, if I may so say, forfeits his right to the child, or at least when he shall so far forget his duty to the child as to entirely neglect to educate him, or refuse to educate him, or permits the child to run at large, so that he becomes a disorderly person within the meaning of section 5 of this statute, or when the child himself, perhaps, even without the consent of the parent, takes upon himself the right to do so, that the state steps in,-and by virtue'of these statutes compels his attendance at school. It declares a child who has arrived at that condition to be a disorderly person. It declares that a parent who has so far forborn to perform his duty to the child to not properly educate him within the limits that are prescribed — which are described as simply the ■elements of a common school education — is guilty of an offense against the welfare of the state — guilty of a misdemeanor— and that he shall be punished by a line. And without discussing the question further, we are of the opinion that the court *656 committed no error in its charge to the jury when it declared that this law was constitutional, and should be enforced.
Another question arises in regard to the charge which should be disposed-of, and that question arises under the indictment, it being claimed that no offense is charged against the plaintiff’ in error in this case. The record shows that a demurrer had been filed to the indictment. It shows that the demurrer was withdrawn, but at the same time it shows that afterwards a demurrer was heard. That demurrer is not found among the papers. But inasmuch as it is competent to demur to an indictment for the reason that it does not state an offense against the laws of the state, we assume that that was the ground upon which the demurrer was based.
The indictment finds that the plaintiff in error “ was, during all of the last week of the month of April, 1890, and ever since has been, pi’incipal and teacher of and in a certain school, which said school was for a long time prior to said last week in April, and during all of said last week ixi April, coxxtinuously held and kept opexx for the attendance of, and was attended by pupils under the age of fourteen years and over, and of the age of 8 years and over, in the city of Toledo.” It will be noticed that the language of the indictment is that he was “ the principal of a certaixx school.” Sec. 11 of the statute provides “ that it shall be the duty of all principals and teach ox’s of all schools, public and private, to weport to the clerk of the board of education,” &o., and the point made is, that when it is said he is the principal of a school, that he might have beexx the principal of some school other than a public or private school, and that thex-efoi’e he was not within the tex’ms of sec. 11 of the statute. But it will be noted here in the first instance that the.broad declax’ation of duty is this : “ that it shall be the duty of all principals and teachers of all schools,” adding “ public and private ; ” and it looks to us as if the declaration “ public and private ” was not intended as a limit to certain schools, but simply to add to the definition,. *657 and make it broader, if it could be, than it was before. It is said, however, that the testimony shows that the plaintiff" in error was the principal, of a parochial school, and that parochial schools are not private schools. But we are unable to agree with counsel in that respect. We are of opinion that parochial schools arc private schools. We suppose, if a certain number of gentlemen were to meet together and agree that they would hire a teacher, and pay him for his services in that school, and no persons should attend that school but their own children, that would be a private school. We cannot see any difference between that school and a school where the congregation of a church should meet together and say “ we will have a school to be supported by this congregation, by the contributions of its members, which shall be open to. the children of this congregation, and in which they shall be educated.” We think that becomes a private school within the terms of the statute, so far as that congregation is concerned, and is a private school as distinguished from a public school, which wo understand to be a school supported by taxation, and by money raised by the state. We think the demurrer was properly overruled.
Another question arose — in regard to the seating accommodations of the schools, and upon that exception.is taken. Sec. 9 provides:
“ That it shall be the duty of officers empowered or appointed under this act to assist in the enforcement thereof, to institute, or cause to be instituted, proceedings against any parent,, or guardian, or other person having legal control or charge of any child, or corporation violating any of the provisions of this act; provided, that this law shall not be operative in any school district where there are not sufficient accommodations to seat children compelled to attend school under the provisions of this act, and that no prosecution shall be instituted against any parent, guardian or other person or child in charge of such school, unless they have received due notification from an officer empowered under this act that they are acting in violation cf this act.”
*658 The court charged in regard to that as follows :
“ Was this law operative in the city school district of the city of Toledo in the last week of April, 1890?
“ Sec. 9 of the law as originally passed, and which has ever since been in force, contains this proviso : ‘ Provided that this law shall not be operative in any school district where there are not sufficient seating accommodations to seat children compelled to attend school under the provisions of this act.’
“ It is contended on the part of the State that this proviso relates only to the preceding provisions of the law, which require children to attend school, aud which have for their object the prevention of truancy; and that it does not relate to the subsequent provisions of the law, which make it the duty o the principals and teachers to make report of the pupils in attendance at their schools. On the other hand it is contended in behalf of the defendant, that the proviso relates to each and all of the provisions of the law. On that subject I give you this instruction : If you find from the evidence that in the last week of April, 1890, the seating capacity of the schools in the city of Toledo was not sufficient to accommodate the children compelled to attend school under the provisions of the law, then- no part of the law was then operative. In that case this provision will not lie, and the defendant must be acquitted.
“ The law as last amended was passed on April 25, 1890. The presumption is that it was in full force and operation in the last week in April, 1890, on and after April 25, and unless this presumption is rebutted and overcome by the evidence in the case, if any, tending to show that the seating capacity <?f the schools was not sufficient to accommodate the children •compelled to attend school, then you will be warranted in finding that the law was then operative.
“ In the first instance, it is incumbent upon the defendant to show that this case is within the proviso — that is to say, it is incumbent upon the defendant, in the first instance, to show that in the last week in April, 1890, the seating capacity of the schools was not sufficient to accommodate the children then *659 compelled to attend school. But, as already stated, the burden of proof is upon the prosecution, and the burden of proof remains with the prosecution during the whole trial. You are, therefore, to take into consideration all the evidence in the case, including the presumption, and from this determine whether, in point of fact, the seating capacity of the schools was sufficient, and therefore whether, in point of fact, the law was operative. ”
The defendant in the same connection claimed that the court should have charged the jury that if the seating capacity of the schools at that date was not sufficient for all the scholars in the city between the ages mentioned— that is to say, if all the scholars, including those attending private and parochial schools, could not have been sufficiently accommodated in the school buildings, then the law was not operative in the city. We agree with the court of common pleas with regard to the construction which should be put upon that statute, and upon the question of the burden of proof in this connection. We think, within the decisions of the Supreme Court of this state, that the case is one where the exception should be proved by the defendant, and accordingly, the defendant offered evidence tending to prove that during the last week of April, 1890, the seating capacity of the schools was not sufficient to accommodate all of the scholars that might of right attend those schools. We think, also, that the construction that is placed by the court upon the law, that it is sufficient if seating capacity is furnished to those who desire to attend the public school (and thus not taking into consideration those who are attending private or parochial schools), is the true construction to be placed upon the act, and that the charge made by the court of common pleas was correct in that respect.
Objection has been made that the evidence does not show that the defendant was the principal of St. Francis de Sales school. We think the testimony shows that he was the principal of that school, and that he was the proper person with *660 whom the blanks should have been left by the' officer who distributed the blanks for the- clerk, and that he is the person upon whom was devolved the duty, under the statute, of making these returns, or causing them to be made. The language of the statute is: “ That it shall be the duty of all principals and teachers of all schools, public and private, to report to the clerk of the board of education of the city, village or township in which schools are situated, the names, ages and residence of all pupils in attendance at their schools, together with such other facts as said clerk may require, in order to facilitate the carrying out of the provisions of this act, and the said clerk shall furnish blanks for said purpose, etc.”- We have read the testimony through very carefully, the whole of it, and, as we have already stated, w.e. are clear in our opinion that the evidence showed the defendant to have been the principal of the school within the requirements of the statute, and that he was in-fact such principal.
F. II. Surd, J. M. JRitchie and F. F. Dunne, for plaintiff in error.
J. A. Barber, Prosecuting Attorney, and J. D. Ford, for the State.
We also have made an examination of the testimony in regard to the number of scholars that.were attending school, as bearing on the question whether the testimony showed that there was sufficient seating capacity for the number of scholars ; and the results of our computations are such as to show that within the rule of law, as laid down by the court, which wc hold to be correct, there was seating capacity in the last week of April, 1890, for over 12,000 children, and that the number of scholars desirous of attending school was less than 11,000, so that there was not only seating capacity for all those that came, but there was surplus room during all of that time.
Having thus stated briefly-the results at which we have arrived, it is our judgment that the judgment of the court of common pleas should be affirmed, and it will be accordingly so ordered.